Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

NEESHA PATEL, derivatively on behalf
of GOODRX HOLDINGS, INC.,

    Plaintiff,

    v.

DOUGLAS HIRSCH, TREVOR
BEZDEK, KARSTEN VOERMANN,
CHRISTOPHER ADAMS, JULIE
BRADLEY, DIPANJAN DEB, ADAM
KAROL, JACQUELINE KOSECOFF,
STEPHEN LESIEUR, GREGORY
MONDRE, and AGNES REY-GIRAUD,

    Defendants,

    and

GOODRX HOLDINGS, INC.,

    Nominal Defendant.

Case No.:

DEMAND FOR JURY TRIAL

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

## INTRODUCTION

Plaintiff Neesha Patel ("Plaintiff"), by her undersigned attorneys, derivatively and on behalf of Nominal Defendant GoodRx Holdings, Inc. ("GoodRx" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Douglas Hirsch ("Hirsch"), Trevor Bezdek ("Bezdek"), Karsten Voermann ("Voermann"), Christopher Adams ("Adams"), Julie Bradley ("Bradley"), Dipanjan Deb ("Deb"), Adam Karol ("Karol"), Jacqueline Kosecoff ("Kosecoff"), Stephen LeSieur ("LeSieur"), Gregory Mondre ("Mondre"), and Agnes Rey-Giraud ("Rey-Giraud") (collectively, the "Individual Defendants," and together with GoodRx, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of GoodRx, unjust enrichment, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, she alleges the following based upon personal knowledge as to her and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding GoodRx, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by GoodRx's directors and officers from September 23, 2020 through November 16, 2020 (the "Relevant Period").

2.     Through its subsidiaries, California-based GoodRx operates as a consumer-focused digital healthcare platform which provides consumers easy access to price transparency and discount codes for, *inter alia*, generic and brand medications across the United States.

3.     As the Company's services are free to consumers, the Company primarily collects revenue through prescription transaction fees paid by entities that manage formularies and prescription transactions (including establishing pricing between consumers and pharmacies) called Pharmacy Benefit Managers ("PBMs"). PBMs pay GoodRx a prescription transaction fee when a prescription is filled using a GoodRx discount code.

4.     Founded as a privately-owned company in September 2011, the Company's management began acting on plans to take the Company public in July 2020. On July 2, 2020, before the beginning of the Relevant Period, the Company filed a draft registration statement on Form DRS with the SEC. About two months later, on August 28, 2020, the Company filed a registration statement on Form S-1 with the SEC (the "Registration Statement") in connection with the planned IPO. On September 14, 2020, the Company filed an amendment to the Registration Statement on Form S-1/A with the SEC. The amendment stated that 39,807,691 would be registered in the IPO, at a proposed maximum offering price per share of $28.00. A second amendment was filed with the SEC on September 22, 2020. The Registration Statement was declared effective the same day, on September 22, 2020.

5.     The Company's stock began trading publicly on The Nasdaq Stock Market LLC ("NASDAQ") the next day, on September 23, 2020. The following day, on September 24, 2020, the Company filed with the SEC a Prospectus on Form 424B4 (the "Prospectus") in connection with the IPO. The Prospectus formed part of and was incorporated into the Registration Statement. The Prospectus, the Registration Statement, and all amendments thereto are collectively referred to herein as the "IPO Documents."

Through the IPO, over 28.6 million shares of stock were sold at $33 per share, including additional shares sold through options exercised by the underwriters to the IPO. As a result of the IPO, GoodRx received aggregate net proceeds of approximately $886.9 million, after deducting underwriter costs and expenses. Out of the total $886.9 million, Idea Men, LLC ("Idea Men"), an entity whose managing members included Defendants Hirsch and Bezdek and Spectrum Equity VII, L.P. ("Spectrum"), an entity whose managing directors included Defendant LeSieur, collectively gained approximately $348.9 million in proceeds from the sale of their own GoodRx shares.

6.     The IPO Documents touted the Company's competitive advantage and detailed the risks facing the Company with respect to, among other things, competitive pressures. The IPO Documents provided that the Company *may* face increased competition in the future that *could* adversely impact GoodRx's business and its ability to attract and retain consumers.

7.     Importantly, the Individual Defendants failed to issue statements correcting the above-referenced material misstatements and omissions in the IPO Documents. In fact, the Company's 3Q20 10-Q (defined below), which the Company filed with the SEC on November 12, 2020—only days before Amazon.com, Inc. ("Amazon") announced its electronic pharmaceutical service designed to compete with GoodRx—repeated many of the same false and misleading statements contained in the IPO Documents including the same boilerplate risk warnings. Also, in response to a question about changes in the "competitive environment" during an earnings call that the Company held on that same day, November 12, 2020, Defendant Bezdek declared that the Company had "not seen … any competitors that have really impacted [GoodRx's] business[.]"

8.     These statements, of course, omitted certain crucial details relating to the competitive landscape of the market—namely, that Amazon had been developing a similar price transparency and discount platform for pharmaceutical products which would render Amazon a direct competitor of GoodRx, that Amazon's platform would be

launching shortly after the IPO and only days after the Company released its third quarter financial results, and that, as a result, the possibility of increased competition in the future was not a mere hypothetical, but a serious risk which posed an existential threat to the Company and had already materialized.

9.      Specifically, the IPO Documents and 3Q20 10-Q failed to disclose that Amazon would be launching two new pharmacy offerings beginning in November 2020 that would offer, among other things, Amazon Prime members up to an 80% discount off of the price of generic medications and up to a 40% discount off of the price of brand-name prescription medications. On November 17, 2020, Amazon issued a press release which introduced "Amazon Pharmacy."

10.     On this news, the price of the Company's stock dropped from $46.72 per share at the close of trading on November 16, 2020, to $36.21 at the close of trading on November 17, 2020, a drop of $10.51, or approximately 22.5%, on very heavy trading volume.

11.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about GoodRx's business, operations, and compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Amazon was creating and would soon release its own cyber and mobile service for ordering discounted prescription medication; (2) the Individual Defendants intentionally planned the IPO prior to Amazon announcing its pharmaceutical service to the market so that the increased competition in the market would not be factored into the Company's share price at the time of GoodRx's IPO; and (3) therefore, the IPO was planned with the intention of generating artificially inflated demand for shares of GoodRx common stock. As a result of the foregoing, GoodRx's public statements were materially false and misleading at all relevant times.

12.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

13.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

14.     In light of the Individual Defendants' misconduct, which has subjected GoodRx, its two Co-Chief Executive Officers ("Co-CEO"), and its Chief Financial Officer ("CFO"), to being named as defendants in a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

15.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Co-CEOs' and CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of GoodRx's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

Verified Shareholder Derivative Complaint

16.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

17.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

18.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a conducting business in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

21.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

22.    Venue is proper in this District because GoodRx and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

23.    Plaintiff is a current shareholder of GoodRx common stock. Plaintiff has continuously held GoodRx common stock at all relevant times.

### Nominal Defendant GoodRx

24.     GoodRx is a Delaware corporation with its principal executive offices located at 2701 Olympic Boulevard, Santa Monica, CA 90404. GoodRx's shares trade on the NASDAQ under the ticker symbol "GDRX."

25.     The company's common stock is divided into two classes: Class A and Class B. Class B common stock differs from Class A common stock in that each Class B common stock share is entitled to ten votes as opposed to Class A's one vote per share. Class B common stock is convertible into one share of Class A common stock at any time at the option of the holder of the share and will automatically convert to Class A common stock, under most circumstances, if transferred. Regardless of transfers, all remaining Class B common stock will automatically convert to Class A common stock upon the earlier of (i) September 25, 2027; and (ii) the first date the aggregate number of shares of Class B common stock cease to represent at least 10% of the aggregate outstanding shares of common stock.

## Defendant Hirsch

26.     Defendant Hirsch is the co-founder of the Company, and has served as one of the Company's Co-CEOs since January 2015 and as a Company director since September 2011. Previously, he served as the CEO from September 2011 until January 2015.

27.     For the fiscal year ended December 31, 2020, Defendant Hirsch received $267,650,186 in compensation from the Company. This included $500,000 in salary, $785 in bonus, $266,662,480 in stock awards, $480,000 in non-equity incentive plan compensation, and $6,921 in all other compensation.

28.     The Company's annual report filed on Form 10-K with the SEC on March 11, 2021 (the "2020 10-K") stated the following about Defendant Hirsch:

> Mr. Hirsch is one of our co-founders and has served as a Chief Executive Officer and as a member of our board of directors since our founding in September 2011. From January 2015, Mr. Hirsch served as our Co-Chief Executive Officer. Prior to our founding, Mr. Hirsch served as Chief

Executive Officer at DailyStrength, Inc., a healthcare-focused social network centered on support groups, from March 2005 to November 2008, and previously held senior roles at Facebook, Inc., and Yahoo! Inc. Mr. Hirsch holds a B.A. in Political Science from Tufts University. We believe Mr. Hirsch is qualified to serve on our board of directors because of the historical knowledge, operational expertise, leadership, and continuity that he brings to our board of directors as our co-founder and Co-Chief Executive Officer.

**Defendant Bezdek**

29.    Defendant Bezdek is the co-founder of the Company, and has served as one of the Company's Co-CEOs since January 2015 and as a Company director since September 2011. He also serves as a member of the Compliance Committee and as a member of the Nominating and Corporate Governance Committee.

30.    For the fiscal year ended December 31, 2020, Defendant Bezdek received $267,652,442 in compensation from the Company. This included $500,000 in salary, $451 in bonus, $266,662,480 in stock awards, $480,000 in non-equity incentive plan compensation, and $9,511 in all other compensation.

31.    The 2020 10-K stated the following about Defendant Bezdek:

Mr. Bezdek is one of our co-founders and has served as our Co-Chief Executive Officer since January 2015 and as a member of our board of directors since our founding in September 2011. Mr. Bezdek also serves as President and Chief Executive Officer of two of our wholly-owned subsidiaries. Previously, Mr. Bezdek served as Managing Partner at Tryarc, LLC, an information technology consulting firm from 2001 to 2007, and co-founded Bioware, a community for biologists and scientists. Mr. Bezdek holds a B.S. in Biological Sciences from Stanford University. We believe Mr. Bezdek is qualified to serve as a member of our board of directors because of his extensive experience in the healthcare, prescription medication and technology industries, in addition to the continuity he brings as one of our co-founders and Co-Chief Executive Officers.

**Defendant Voermann**

32.    Defendant Voermann has served as the Company's CFO since March 2020.

33.     According to Defendant Voermann's offer letter, effective February 12, 2020, Defendant Voermann began working as the Company's CFO on March 2, 2020, and, as a result, he was entitled to a base salary of $400,000 per year, a signing bonus of $250,000, and other compensation in the form of certain benefits and equity compensation.

34.     The 2020 10-K stated the following about Defendant Voermann:

Mr. Voermann has served as our Chief Financial Officer since March 2020. From May 2018 to February 2020, Mr. Voermann served as Chief Financial Officer of Mercer Advisors, an investment advisory services firm, and from July 2015 to May 2018, Mr. Voermann served as Chief Financial Officer of Ibotta, an app-based provider of consumer discounts on consumer packaged goods and other items, and has over 20 years of financial experience with public and private companies. Mr. Voermann holds an H.B.A. in Business from the University of Western Ontario and an M.B.A. from Harvard Business School.

**Defendant Adams**

35.     Defendant Adams has served as a Company director since October 2015. He also serves as the Chair of the Nominating and Corporate Governance Committee.

36.     The 2020 10-K stated the following about Defendant Adams:

Mr. Adams has served as a member of our board of directors since October 2015. Mr. Adams is a Partner at Francisco Partners Management, L.P. ("Francisco Partners") a private equity firm, where he has served since August 2008. Prior to this, Mr. Adams was an associate at American Securities Capital Partners, a private equity firm, and a management consultant at Bain & Company. Mr. Adams also serves on the board of directors of several private companies. Mr. Adams holds a B.S. in Computer Engineering from the Georgia Institute of Technology and an M.B.A. from the Stanford Graduate School of Business. We believe that Mr. Adams is qualified to serve as a member of our board of directors because of his extensive experience in analyzing, investing in, and serving on the board of directors of several healthcare and technology companies from working in the private equity industry.

**Defendant Bradley**

Verified Shareholder Derivative Complaint

37.     Defendant Bradley has served as a Company director since August 2020. She also serves as the Chair of the Audit Committee.

38.     For the fiscal year ended December 31, 2020, Defendant Bradley received $748,207 in compensation from the Company. This included $5,707 in fees earned or paid in cash and $742,500 in stock awards.

39.     The 2020 10-K stated the following about Defendant Bradley:

Ms. Bradley has served as a member of our board of directors since August 2020. Ms. Bradley previously served as the Chief Financial Officer of Tripadvisor, Inc., a public company that operates an online travel planning website and mobile app, from October 2011 to November 2015. Currently, Ms. Bradley serves on the board of directors of Wayfair Inc., since September 2012, where she is the member of the Audit Committee and Nominating and Governance Committee, and Blue Apron Holdings, Inc., since September 2015, where she serves on the Audit Committee and Compensation Committee. Ms. Bradley previously served on the board of directors of Constant Contact, Inc. from June 2015 to February 2016, where she served on the Audit Committee, Compensation Committee and Merger and Acquisition Committee. Ms. Bradley additionally serves on the board of directors for a private company. Ms. Bradley received a B.A. in Economics from Wheaton College. We believe Ms. Bradley is qualified to serve on our board of directors due to her financial expertise and experience serving on the board of directors of numerous technology-based companies.

**Defendant Deb**

40.     Defendant Deb has served as a Company director since October 2015. He also serves as a member of the Compensation Committee.

41.     The 2020 10-K stated the following about Defendant Deb:

Mr. Deb has served as a member of our board of directors since October 2015. Mr. Deb is a founder of Francisco Partners and has served as the Managing Partner/Chief Executive Officer of Francisco Partners since September 2005. Mr. Deb has also served as a Partner of Francisco Partners since its founding in August 1999. Prior to founding Francisco Partners, Mr. Deb was a principal at TPG Capital, a private equity firm, a Director of Semiconductor Banking at Robertson, Stephens & Company and a management consultant at McKinsey & Company. Mr. Deb has served on

the board of directors of numerous public companies including most recently Ichor Systems, Inc. from February 2012 to May 2018, and currently serves on the board of directors of several private companies. Mr. Deb holds a B.S. in Electrical Engineering and Computer Science from the University of California, Berkeley and an M.B.A. from the Stanford Graduate School of Business. We believe that Mr. Deb is qualified to serve as a member of our board of directors because of his experience in the private equity and venture capital industries analyzing, investing in and serving on the boards of directors of manufacturing and technology companies.

**Defendant Karol**

42.     Defendant Karol has served as a Company director since October 2018. He also serves as a member of the Audit Committee and as a member of the Compliance Committee.

43.     The 2020 10-K stated the following about Defendant Karol:

Mr. Karol has served as a member of our board of directors since October 2018. Mr. Karol is a Managing Director at Silver Lake. He joined Silver Lake in 2009 as a Principal and then served as a Director from 2013 to December 2018. Prior to Silver Lake, Mr. Karol worked at Silver Point Capital, L.P., an asset management firm, and at Perry Capital, a multi-strategy investment firm. Mr. Karol serves on the board of directors for A Place for Mom, Inc. Mr. Karol holds a B.S. in Finance and Management Information Systems from Boston College and an M.B.A. from The Wharton School of the University of Pennsylvania. We believe Mr. Karol is qualified to serve on our board of directors because he has significant experience in private equity investing and expertise in technology investing.

**Defendant Kosecoff**

44.     Defendant Kosecoff has served as a Company director since May 2016. She also serves as a member of the Compensation Committee.

45.     For the fiscal year ended December 31, 2020, Defendant Kosecoff received $121,842 in compensation from the Company. This included $25,242 in fees earned or paid in cash and $96,600 in option awards.

46.     The 2020 10-K stated the following about Defendant Kosecoff:

Dr. Kosecoff has served as a member of our board of directors since May

2016. Dr. Kosecoff is a Managing Partner at Moriah Partners, LLC, where she has served since 2012. Dr. Kosecoff has also served as a Senior Advisor at Warburg Pincus since March 2012. Dr. Kosecoff has had an extensive career in healthcare including serving as Executive Vice President of PacifiCare where she had responsibility for its PBM, Medicare Part D Drug Program, and Behavioral Health, Dental and Vision companies. At UnitedHealth Group, Dr. Kosecoff was CEO of OptumRx, with responsibility for UnitedHealth's PBM, Specialty Pharmacy and Consumer Health Products. Currently, Dr. Kosecoff serves on the board of directors of Houlihan Lokey, where she also serves on Houlihan Lokey's Audit Committee and Nominating and Governance Committee, Sealed Air Corporation where she chairs the Compensation Committee and also serves on the Nominating and Governance Committee, STERIS Corporation, where she chairs the Organization and Compensation Committee and also serves on the Nominating and Governance Committee, TriNet, and several private companies. Dr. Kosecoff holds a B.A. in Mathematics from the University of California, Los Angeles, an M.S. in Applied Mathematics from Brown University and a Ph.D. with a concentration in Research Methods from the University of California, Los Angeles, School of Education. We believe Dr. Kosecoff is qualified to serve on our board of directors because of her extensive experience serving on the board of directors of several public and private companies and her experience and knowledge in the healthcare sector, including healthcare services and technology.

**Defendant LeSieur**

47.     Defendant LeSieur has served as a Company director since October 2015. He also serves as a member of the Compliance Committee.

48.     The 2020 10-K stated the following about Defendant LeSieur:

Mr. LeSieur has served as a member of our board of directors since October 2015. Mr. LeSieur is a Managing Director at Spectrum Equity, a growth stage private equity firm, where he has served since 2005 and co-leads the firm's healthcare technology investing efforts. Prior to Spectrum, Mr. LeSieur was an associate at Trident Capital. Mr. LeSieur serves and has served on the board of directors of several private healthcare and software companies. Mr. LeSieur holds a B.A. in Economics from Princeton University and an M.B.A. from the Tuck School of Business at Dartmouth College. We believe Mr. LeSieur is qualified to serve on our board of directors because of his extensive experience in private equity investing and serving on the boards of directors of numerous healthcare and technology-

based companies.

**Defendant Mondre**

49.     Defendant Mondre has served as a Company director since October 2018. He also serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee.

50.     The 2020 10-K stated the following about Defendant Mondre:

> Mr. Mondre has served as a member of our board of directors since October 2018. Mr. Mondre is Co-Chief Executive Officer at Silver Lake. He joined Silver Lake in 1999 and most recently served as a Managing Partner and Managing Director of the firm from January 2013 to December 2019. Mr. Mondre currently serves on the board of directors of Expedia Group, Inc., a position he has held since May 2020, and Motorola Solutions, a position he has held since August 2015 and where he also serves on the Audit and Governance and Nominating Committees. He previously served as a director of GoDaddy Inc. from May 2014 to February 2020, and of Sabre Corporation from March 2007 to December 2018. Mr. Mondre holds a B.S. degree in Economics from The Wharton School of the University of Pennsylvania. We believe Mr. Mondre is qualified to serve on our board of directors because of his significant experience in private equity investing and expertise in technology and technology-enabled industries.

**Defendant Rey-Giraud**

51.     Defendant Rey-Giraud has served as a Company director since June 2016. She also serves as the Chair of the Compliance Committee and as a member of the Audit Committee.

52.     For the fiscal year ended December 31, 2020, Defendant Rey-Giraud received $118,601 in compensation from the Company. This included $21,359 in fees earned or paid in cash and $97,242 in option awards.

53.     The 2020 10-K stated the following about Defendant Rey-Giraud:

> Ms. Rey-Giraud has served as a member of our board of directors since June 2016. Ms. Rey-Giraud is the Founder, Chairman and Chief Executive Officer of Acera Surgical Inc., a bioscience company, where she has served since its founding in January 2013. Ms. Rey-Giraud previously served as an Executive Vice President and the President of Operations at Express Scripts,

a pharmacy benefit management organization, from May 1999 to May 2011. Ms. Rey-Giraud also serves on the board of directors for several private companies. Ms. Rey-Giraud holds a B.S. and M.S. in Mechanical Engineering from Ecole Nationale d'Ingenieurs de Saint Etienne (ENISE), France, a MMa in Operations Management from Ecole de Management de Lyon (EM Lyon), France and an M.B.A. from the University of Chicago. We believe Ms. Rey-Giraud is qualified to serve on our board of directors because of her experience and expertise in the PBM industry as an executive of a large publicly traded company and her experience serving on the board of directors of several companies.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

54.     By reason of their positions as officers, directors, and/or fiduciaries of GoodRx and because of their ability to control the business and corporate affairs of GoodRx, the Individual Defendants owed GoodRx and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage GoodRx in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of GoodRx and its shareholders so as to benefit all shareholders equally.

55.     Each director and officer of the Company owes to GoodRx and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

56.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of GoodRx, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

57.     To discharge their duties, the officers and directors of GoodRx were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

58.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties

of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of GoodRx, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised GoodRx's Board at all relevant times.

59.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

60.    To discharge their duties, the officers and directors of GoodRx were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of GoodRx were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to GoodRx's own Code of Business Ethics and Conduct

(the "Code of Conduct");

(b)  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)  remain informed as to how GoodRx conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)  establish and maintain systematic and accurate records and reports of the business and internal affairs of GoodRx and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)  maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that GoodRx's operations would comply with all applicable laws and GoodRx's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)  exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)  refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)  examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

61.    Each of the Individual Defendants further owed to GoodRx and the shareholders the duty of loyalty requiring that each favor GoodRx's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

62.    At all times relevant hereto, the Individual Defendants were the agents of each other and of GoodRx and were at all times acting within the course and scope of such agency.

63.    Because of their advisory, executive, managerial, and directorial positions with GoodRx, each of the Individual Defendants had access to adverse, non-public information about the Company.

64.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by GoodRx.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

65.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

66.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets.

67. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of GoodRx was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

68. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

69. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of GoodRx and was at all times acting within the course and scope of such agency.

## **GOODRX'S CODE OF CONDUCT**

70. The Company's Code of Conduct states that it "applies to all of our directors, officers and other employees" and that it "contains general guidelines for conducting [the Company's business] consistent with the highest standards of business ethics."

71. In a section titled, "Reporting Violations of the Code," the Code of Conduct states the following, in relevant part:

All employees and directors have a duty to report any known or suspected violation of this Code, including violations of the laws, rules, regulations or policies that apply to the Company. If you know of or suspect a violation of this Code, immediately report the conduct to your supervisor or the Company's General Counsel.

72.   In a section titled, "Conflicts of Interest," the Code of Conduct states the following, in relevant part:

Employees, officers and directors must act in the best interests of the Company. You must refrain from engaging in any activity or having a personal interest that presents a "conflict of interest" and should seek to avoid even the appearance of a conflict of interest. A conflict of interest occurs when your personal interest interferes with the interests of the Company. A conflict of interest can arise whenever you, as an employee, officer or director, take action or have an interest that prevents you from performing your Company duties and responsibilities honestly, objectively and effectively.

73.   In a section titled, "Competition and Fair Dealing," the Code of Conduct states the following:

All employees should endeavor to deal fairly with fellow employees and with the Company's collaborators, licensors, customers, suppliers and competitors. Employees should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice. Employees should maintain and protect any intellectual property licensed from licensors with the same care as they employ with regard to Company-developed intellectual property. Employees should also handle the nonpublic information of our collaborators, licensors, suppliers and customers responsibly and in accordance with our agreements with them, including information regarding their technology and product pipelines.

74.   The "Accuracy of Financial Reports and Other Public Communications" section of the Code of Conduct states the following:

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate,

19

Verified Shareholder Derivative Complaint

incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The Company's principal financial officers and other employees working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

75. The "Compliance with Laws and Regulations" section of the Code of Conduct states the following, in relevant part:

Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position.

76. The Individual Defendants violated GoodRx's Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the investing public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, and failing to report the same. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and conduct themselves in an honest and ethical manner.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

77.     GoodRx is a California-based holding company which, through its subsidiaries, namely GoodRx, Inc., operates as a consumer-focused digital healthcare platform in the United States that was purportedly founded to solve the challenges that consumers face in understanding, accessing, and affording healthcare. Specifically, the Company seeks to provide easy access to price transparency and affordability solutions for, *inter alia*, generic and brand medications through the operation of its price comparison platform that provides consumers with curated, geographically relevant prescription pricing information, and provides access to negotiated prices through GoodRx codes that can be used to save money on prescriptions across the United States.

78.     The holding Company was incorporated in September 2015 and on October 7, 2015, the Company acquired 100% of the outstanding shares of GoodRx, Inc., which was initially formed and founded by Defendants Hirsch and Bezdek in September 2011.

79.     Since the Company's services are available at no cost to consumers, the Company mainly generates revenue through prescription transaction fees remunerated by PBMs—entities that manage formularies and prescription transactions including establishing pricing between consumers and pharmacies—upon the filling of a prescription with a GoodRx discount code. Typically, pursuant to the agreements between GoodRx and PBMs, the prescription transaction fee is either paid in the form of a percentage of fees that the PBM charges the pharmacy or a fixed amount per type of drug prescription. GoodRx recognizes revenue for its estimated fee due from the customers when a prescription for medication is filled.

**GoodRx's IPO**

80.     In July 2020, the Individual Defendants began implementing steps to take the Company public. On July 2, 2020, the Company filed a draft registration statement on Form DRS with the SEC. Nearly two months later, on August 28, 2020, the Company filed the Registration Statement. On September 14, 2020, the Company filed an amendment to the Registration Statement on Form S-1/A with the SEC. The amendment

stated that 39,807,691 shares would be registered in the IPO, at a proposed maximum offering price per share of $28.00. A second amendment was filed with the SEC on September 22, 2020. The Registration Statement was declared effective after the close of trading on that same day, September 22, 2020.

81.     The Company's stock began trading publicly on the NASDAQ the next day, on September 23, 2020. Subsequently, on September 24, 2020, the Company filed with the Prospectus on Form 424B4. Through the IPO, which closed the next day, September 25, 2020, over 28.6 million shares of stock were sold at $33 per share, including additional shares sold through options exercised by the underwriters to the IPO. The IPO closed, with the Company having sold 28,615,034 shares of Company stock to the public at $33 per share and an additional 5,192,307 shares pursuant to the option for underwriters to purchase additional shares in the IPO. As a result of the IPO, GoodRx received aggregate net proceeds of approximately $886.9 million, after deducting underwriter discounts and commissions of $52.5 million and other offerings expenses of $4.9 million.

**The Individual Defendants Knew Amazon Was Developing Online Pharmaceutical Services to Compete with GoodRx**

82.     During the Relevant Period, when the Individual Defendants made and/or caused the Company to make, the materially false and misleading statements to artificially inflate the Company's stock price, the Individual Defendants either had actual knowledge or acted in reckless disregard for the truth that Amazon had been in the process of developing and would soon be announcing the launch of its pharmaceutical endeavors intended to compete directly with GoodRx.

83.     Initially, the Company's IPO was timed to close prior to Amazon's announcement so that the Individual Defendants could maximize the amount of capital it and the selling shareholders (including, among others, Idea Men, whose managing members included Defendants Hirsch and Bezdek, Spectrum Equity VII, L.P., whose managing directors included Defendant LeSieur, and non-party Andrew Slutsky), raised.

In the IPO, $886.9 million was raised and out of that amount, the selling stockholders raised over $369 million. Out of that $369 million, Idea Men, Spectrum, and non-party Slutsky collectively gained approximately $356.2 million in proceeds from the sale of their own GoodRx shares. This demonstrates the Individual Defendants' motive in facilitating and participating in the fraud.

84.     As described above, the Company primarily earns revenue from its core business which is collecting on prescription transaction fees paid by PBMs upon the filling of drugs that are purchased by consumers using GoodRx discount codes. Thus, the price comparison platform that provides access to discounted prices of prescription drugs to consumers through GoodRx codes represented the Company's core operation. As this was the Company's primary service, it was undoubtedly vital to the Company's financial viability and its business prospects, and the development of a competitor that offered steep discounts, such as up to 80% off generic drugs and up to 40% off brand-name prescriptions, would be known to at least the Company's officers and directors as it would pose an existential threat to the Company's business. Consequently, senior executives and directors of the Company are presumed to have knowledge and awareness of facts and circumstances related to Amazon's pharmaceutical offerings during the Relevant Period.

85.     Finally, the Individual Defendants had knowledge that Amazon had been developing and would soon be introducing its pharmaceutical offerings since Amazon was a close business partner of GoodRx. As acknowledged in the IPO Documents, the Company maintains a direct relationship with Amazon in that it used Amazon Web Services to build a "modular system of services" and relies on Amazon Web Services for a "substantial portion" of the Company's computing and storage capacity. Moreover, Amazon was able to offer its steep discounted prices through the savings program of Inside Rx, LLC, a company that GoodRx had partnered with since May 2017 on lowering the price of more than 209 brand-name prescription medications. Therefore, the

Individual Defendants would have known about Amazon's pharmaceutical offerings during the Relevant Period.

### False and Misleading Statements

#### The IPO Documents

86.    On September 24, 2020, the day after the Company's stock began trading on the NASDAQ, the Company filed with the SEC the Prospectus in connection with the IPO. The Prospectus formed part of the Company's Registration Statement on Form S-1 filed on August 28, 2020, before the Company went public. The Registration Statement was signed by the Individual Defendants.

87.    In a discussion of the overview of the Company's business, the IPO Documents stated the following, in relevant part, with respect to the Company's durable competitive footing:

> ***Our partnerships across the healthcare ecosystem, scale and strong consumer brand create a deep competitive moat that is reinforced by our proprietary technology platform***, which processes over 150 billion pricing data points every day and integrates that data into an interface that is convenient and easy to use for consumers.

(Emphasis added.)

88.    The IPO Documents also stated the following regarding the Company's strong "competitive position" in the market: "***[w]e are a market leader with a significant scale and brand advantage over our competitors. Our growth accelerates self-reinforcing network effects that further strengthen our competitive position***." (Emphasis added.)

89.    The IPO Documents touted the Company's advantages that supposedly separated GoodRx from the rest of its competitors, stating the following, in relevant part:

**What Sets Us Apart**

> ***We are a market leader with a significant scale and brand advantage over our competitors. Our growth accelerates self-reinforcing network effects***

*that further strengthen our competitive position. Our competitive strengths consist of*:

- **Leading Platform:** We believe that we are the largest platform that aggregates pricing for prescriptions. Our proprietary platform enables us to collect and normalize over 150 billion prescription pricing data points every day from sources spanning the healthcare industry.

- **Trusted Brand:** We have built a trusted brand based on nearly a decade of consumer-focused product development. We strive to be with the consumer throughout their healthcare journey. We are guided by the principle of doing well for consumers and the healthcare industry as a whole, which we believe helps us build trust, engagement and brand loyalty.

- **Scaled and Growing Network:** Our leading consumer-focused digital healthcare platform and brand have facilitated rapid growth in our consumer base, which has helped us achieve significant scale. As we have scaled, we have been able to increase the savings that we provide our consumers, in part by leveraging our growing consumer base to attract more partners and source better prices.

- **Consumer-focus:** We empower consumers with the tools and resources to navigate the complexity of the healthcare system. Our platform delivers a consumer-first experience that is convenient and is easy to use and understand.

- **Extensible Platform:** The large number of highly engaged consumers who trust our brand and platform provide a strong foundation for the development of new products that extend across the healthcare market. We have demonstrated our ability to develop new products such as our subscription offerings and pharmaceutical manufacturer solutions offering, and integrate acquired companies such as HeyDoctor.

- **Cash Generative Monetization Model:** We believe our business model has facilitated the rapid growth and expansion of our platform. We have a track record of generating cash flows, allowing us to reinvest in platform expansion and growth.

Verified Shareholder Derivative Complaint

(Emphasis added, except for headings.)

90.     The IPO Documents provided boilerplate, hypothetical risk warnings related to potential market forces driven by competition that "could" adversely impact the Company's business, stating the following in relevant part:

> We compete with companies that provide savings on prescriptions, as well as companies that offer telehealth services and advertising and market access for pharmaceutical manufacturers. Within the prescriptions market, our competition is fragmented and consists of competitors that are smaller than us in scale. There can be no assurance that competitors will not develop and market similar offerings to ours, or that industry participants, such as integrated PBMs and pharmacy providers, will not seek to leverage our platform to drive consumer demand and traffic to their networks and eventually away from, or outside of, our platform. We ***may*** face increased competition from those that attempt to replicate our business model or marketing tactics, such as discount websites, apps, cash back and loyalty programs and new comparison shopping sites from various industry participants, any of which ***could*** impact our ability to attract and retain consumers.

(Emphasis added.)

91.     The IPO Documents also flaunted the Company's market share and consumer data, stating the following, in relevant part:

> Our success is demonstrated by our 4.4 million Monthly Active Consumers for the second quarter of 2020, the 15 million Monthly Visitors for the second quarter of 2020, the approximately $20 billion of cumulative consumer savings generated for GoodRx consumers through June 30, 2020 and our consumer and healthcare professional NPS scores of 90 and 86, respectively, as of February 2020. On average, we have been the most downloaded medical app on the Apple App Store and Google Play App Store for the last three years. Our GoodRx app had a rating of 4.8 out of 5.0 stars in the Apple App Store and 4.7 out of 5.0 stars in the Google Play App Store, with over 700,000 combined reviews as of June 30, 2020. In both app stores, our HeyDoctor app had a rating of 5.0 out of 5.0 stars, with over 8,000 combined reviews as of June 30, 2020.

92.     The IPO Documents further advertised the Company's "market demand," stating that "[w]e believe our financial results reflect the significant market demand for our offerings and the value that we provide to the broader healthcare ecosystem."

93.     The IPO Documents emphasized GoodRx's relationship with Amazon and the advantages associated with that relationship. For instance, the IPO Documents stated that the Company "leverage[s] major third-party cloud and data service providers, such as Amazon Web Services" and asserted that the Company had "built a modular system of services on top of this infrastructure" that was "cloud native, scalable and reliable." The IPO Documents went on to state, in relevant part:

**We rely on software-as-a-service, or SaaS, technologies from third parties**.

We rely on SaaS technologies from third parties in order to operate critical functions of our business, including financial management services, relationship management services, marketing services and data storage services. For example, we rely on Amazon Web Services for a substantial portion of our computing and storage capacity . . . . Amazon Web Services provides us with computing and storage capacity pursuant to an agreement that continues until terminated by either party.

**November 12, 2020 Conference Call and Form 10-Q**

94.     On November 12, 2020, the Company issued a press release and held a conference call in connection to the release of GoodRx's earnings results for the third fiscal quarter ended September 30, 2020. During the earnings call an analyst asked Defendant Bezdek to "talk about any changes you're seeing in the competitive environment" to which Defendant Bezdek responded, "*what we've seen is we have not seen sort of any competitors that have really impacted our business in any way sort of historically or currently*." (Emphasis added.)

95.     Also on November 12, 2020, the Company filed with the SEC its quarterly report for the third fiscal quarter ended September 30, 2020 on Form 10-Q (the "3Q20 10-Q"). The 3Q20 10-Q was signed by Defendants Hirsch, Bezdek, and Voermann and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange

Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Hirsch, Bezdek, and Voermann attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

96.    In its section on "Risk Factors," the 3Q20 10-Q made the same generic risk warning that the Individual Defendants caused the Company to make in the IPO Documents with respect to the hypothetical competitive pressure GoodRx was facing. The 3Q20 10-Q stated the following:

> We compete with companies that provide savings on prescriptions, as well as companies that offer telehealth services and advertising and market access for pharmaceutical manufacturers. Within the prescriptions market, our competition is fragmented and consists of competitors that are smaller than us in scale. There can be no assurance that competitors will not develop and market similar offerings to ours, or that industry participants, such as integrated PBMs and pharmacy providers, will not seek to leverage our platform to drive consumer demand and traffic to their networks and eventually away from, or outside of, our platform. We ***may*** face increased competition from those that attempt to replicate our business model or marketing tactics, such as discount websites, apps, cash back and loyalty programs and new comparison shopping sites from various industry participants, any of which ***could*** impact our ability to attract and retain consumers.

(Emphasis added.)

97.    The 3Q20 10-Q stated the following concerning the Company's monthly active consumers:

> The number of Monthly Active Consumers is a key indicator of the scale of our consumer base and a gauge for our marketing and engagement efforts. We believe that this metric reflects our scale, growth and engagement with consumers. The number of Monthly Active Consumers grew 29% in the three months ended September 30, 2020 to 4.9 million, compared to 3.8 million in the three months ended September 30, 2019.

98.    Like the IPO Documents, the 3Q20 10-Q also touted the Company's "significant market demand," stating that "[w]e believe our financial results reflect the significant market demand for our offerings and the value that we provide to the broader healthcare ecosystem."

99.    Similarly to the IPO Documents, the 3Q20 10-Q highlighted GoodRx's relationship with Amazon stating, in relevant part:

***We rely on software-as-a-service ("SaaS") technologies from third parties***.

We rely on SaaS technologies from third parties in order to operate critical functions of our business, including financial management services, relationship management services, marketing services and data storage services. For example, we rely on Amazon Web Services for a substantial portion of our computing and storage capacity . . . . Amazon Web Services provides us with computing and storage capacity pursuant to an agreement that continues until terminated by either party.

(Emphasis added.)

100.   The statements in ¶¶ 87–94 and 96–99 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) Amazon was creating and would soon release its own cyber and mobile service for ordering discounted prescription medication; (2) the Individual Defendants intentionally planned the IPO prior to Amazon announcing its pharmaceutical service to the market so that the increased competition in the market would not be factored into the Company's share price at the time of GoodRx's IPO; and (3) therefore, the IPO was planned with the intention of generating artificially inflated demand for shares of GoodRx common stock. As a result of the foregoing, GoodRx's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

101.   On November 17, 2020, less than two months after the IPO, Amazon issued a press release titled, "Introducing Amazon Pharmacy: Prescription Medications Delivered." The press release announced two new pharmacy offerings which positioned Amazon as a direct competitor with GoodRx, stating:

> Amazon.com, Inc. (NASDAQ: AMZN) today announced two new pharmacy offerings to help customers conveniently purchase their prescription medications. Amazon Pharmacy, a new store on Amazon, allows customers to complete an entire pharmacy transaction on their desktop or mobile device through the Amazon App. Using a secure pharmacy profile, customers can add their insurance information, manage prescriptions, and choose payment options before checking out. Prime members receive unlimited, free two-day delivery on orders from Amazon Pharmacy included with their membership.

> Also new today, Prime members can access savings on medications at Amazon Pharmacy when paying without insurance, as well as at over 50,000 other participating pharmacies nationwide. The Amazon Prime prescription savings benefit saves members up to 80% off generic and 40% off brand name medications when paying without insurance. Prime members will have access to their prescription savings at checkout on Amazon Pharmacy, or can learn more at amazon.com/primerx.

> ***Together the Amazon Prime prescription savings benefit and Amazon Pharmacy make it simple for customers to compare prices and purchase medications for home delivery, all in one place***.

(Emphasis added.)

102.   Also on November 17, 2020, *CNBC* reported that Amazon Prime members would be eligible for discounts of as much as 80% off of the price of generic medications and as much as 40% off of the price of brand-name prescription medications by way of Amazon's "relationship with the Inside Rx savings program."

103.   On this news, the price of the Company's stock dropped from $46.72 per share at the close of trading on November 16, 2020, to $36.21 at the close of trading on

November 17, 2020, a drop of $10.51, or approximately 22.5%, on very heavy trading volume.

## DAMAGES TO GOODRX

104.  As a direct and proximate result of the Individual Defendants' conduct, GoodRx has lost and expended, and will lose and expend, many millions of dollars.

105.  Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its Co-CEOs, and its CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

106.  Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

107.  As a direct and proximate result of the Individual Defendants' conduct, GoodRx has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

108.  Plaintiff brings this action derivatively and for the benefit of GoodRx to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of GoodRx, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof.

109.  GoodRx is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

110.  Plaintiff is, and has continuously been at all relevant times, a shareholder of GoodRx. Plaintiff will adequately and fairly represent the interests of GoodRx in

enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

111.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

112.   A pre-suit demand on the Board of GoodRx is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Hirsch, Bezdek, Adams, Bradley, Deb, Karol, Kosecoff, LeSieur, Mondre, and Rey-Giraud (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors that were on the Board at the time this action was commenced.

113.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

114.   In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

115.   Additional reasons that demand on Defendant Hirsch is futile follow. Defendant Hirsch is the co-founder of the Company, and has served as one of the Company's Co-CEOs since January 2015 and as a Company director since September 2011. Previously, he served as the CEO from September 2011 until January 2015. Thus,

as the Company admits, he is a non-independent director. The Company provides Defendant Hirsch with his principal occupation, and he receives handsome compensation, including $267,650,186 during fiscal year 2020. Defendant Hirsch was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Registration Statement, which he signed, and in the 3Q20 10-Q, which he signed and signed SOX certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Hirsch is a defendant in the Securities Class Action. For these reasons, too, Defendant Hirsch breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

116.   Additional reasons that demand on Defendant Bezdek is futile follow. Defendant Bezdek is the co-founder of the Company, and has served as one of the Company's Co-CEOs since January 2015 and as a Company director since September 2011. He also serves as a member of the Compliance Committee and as a member of the Nominating and Corporate Governance Committee. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Bezdek with his principal occupation, and he receives handsome compensation, including $267,652,442 during fiscal year 2020. Defendant Bezdek was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Registration Statement, which he signed, and in the 3Q20 10-Q, which he signed and signed SOX certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties

to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Bezdek is a defendant in the Securities Class Action. For these reasons, too, Defendant Bezdek breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

117.   Additional reasons that demand on Defendant Adams is futile follow. Defendant Adams has served as a Company director since October 2015. He also serves as the Chair of the Nominating and Corporate Governance Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Adams also signed, and thus personally made the false and misleading statements in the Registration Statement. For these reasons too, Defendant Adams breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

118.   Additional reasons that demand on Defendant Bradley is futile follow. Defendant Bradley has served as a Company director since August 2020. She also serves as the Chair of the Audit Committee. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Bradley also signed, and thus personally made the false and misleading statements in the Registration Statement. For these reasons too, Defendant Bradley breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

119. Additional reasons that demand on Defendant Deb is futile follow. Defendant Deb has served as a Company director since October 2015. He also serves as a member of the Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Deb also signed, and thus personally made the false and misleading statements in the Registration Statement. For these reasons too, Defendant Deb breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

120. Additional reasons that demand on Defendant Karol is futile follow. Defendant Karol has served as a Company director since October 2018. He also serves as a member of the Audit Committee and as a member of the Compliance Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Karol also signed, and thus personally made the false and misleading statements in the Registration Statement. For these reasons too, Defendant Karol breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

121. Additional reasons that demand on Defendant Kosecoff is futile follow. Defendant Kosecoff has served as a Company director since May 2016. She also serves as a member of the Compensation Committee. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such

controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Kosecoff also signed, and thus personally made the false and misleading statements in the Registration Statement. For these reasons too, Defendant Kosecoff breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

122.  Additional reasons that demand on Defendant LeSieur is futile follow. Defendant LeSieur has served as a Company director since October 2015. He also serves as a member of the Compliance Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant LeSieur also signed, and thus personally made the false and misleading statements in the Registration Statement. For these reasons too, Defendant LeSieur breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

123.  Additional reasons that demand on Defendant Mondre is futile follow. Defendant Mondre has served as a Company director since October 2018. He also serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Mondre also signed, and thus personally made the false and misleading statements in the Registration Statement. For these reasons too, Defendant

Mondre breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

124.   Additional reasons that demand on Defendant Rey-Giraud is futile follow. Defendant Rey-Giraud has served as a Company director since June 2016. She also serves as the Chair of the Compliance Committee and as a member of the Audit Committee. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Rey-Giraud also signed, and thus personally made the false and misleading statements in the Registration Statement. For these reasons too, Defendant Rey-Giraud breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

125.   Additional reasons that demand on the Board is futile follow.

126.   The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendants Hirsch and Bezdek co-founded the Company together in September 2011 and have served together as directors and Co-Chief CEOs of the Company since that time. Further, Defendants Adams and Deb have worked together at Francisco Partners Management, L.P. ("Francisco Partners") for many years. Specifically, Defendant Adams has worked at Francisco Partners as a Partner since August 2008. Defendant Deb is a founder of Francisco Partners where he has served as the Managing Partner/CEO since September 2005 and as a Partner since its founding in August 1999. Moreover, Defendants Karol and Mondre have worked together at Silver Lake. Specifically, Defendant Karol joined Silver Lake in 2009 as a Principal and then served as a director from 2013 until December 2018 when he became a Managing Director.

Defendant Mondre joined Silver Lake in 1999 where he is currently the Co-CEO. Previously, Defendant Mondre served as Silver Lake's Managing Partner and Managing Director from January 2013 until December 2019. Moreover, Defendants Karol and Mondre serve together on the board of directors for A Place for Mom, Inc. Defendant Mondre serves as a member of the board of directors of Fanatics, Inc. where Defendant Karol has served as a board observer since August 2015. Additionally, Defendants Bezdek, Hirsch, Adams, Deb, Kosecoff, LeSieur, and Rey-Giraud have served together on the Board for at least approximately five years. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

127. Defendants Bradley, Karol, and Rey-Giraud (the "Audit Committee Defendants"), served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the integrity of the Company's financial statements, compliance with legal and regulatory requirements, and matters implicating ethical concerns. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

128. In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets. In violation of the Code of Conduct, the Directors failed to comply with

the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

129.   GoodRx has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for GoodRx any part of the damages GoodRx suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

130.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

131.   The acts complained of herein constitute violations of fiduciary duties owed by GoodRx's officers and directors, and these acts are incapable of ratification.

132.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of GoodRx. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of GoodRx, there would be no directors' and officers' insurance protection. Accordingly, the Directors

cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

133. If there is no directors' and officers' liability insurance, then the Directors will not cause GoodRx to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

134. Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

135. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

136. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of GoodRx's business and affairs.

137. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

138. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of GoodRx.

139. In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

140.   In further breach of their fiduciary duties owed to GoodRx, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) Amazon was creating and would soon release its own cyber and mobile service for ordering discounted prescription medication; (2) the Individual Defendants intentionally planned the IPO prior to Amazon announcing its pharmaceutical service to the market so that the increased competition in the market would not be factored into the Company's share price at the time of GoodRx's IPO; and (3) therefore, the IPO was planned with the intention of generating artificially inflated demand for shares of GoodRx common stock. As a result of the foregoing, GoodRx's public statements were materially false and misleading at all relevant times.

141.   The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

142.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

143.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and

that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

144. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

145. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, GoodRx has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

146. Plaintiff on behalf of GoodRx has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

147. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

148. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, GoodRx.

149. The Individual Defendants either benefitted financially from the improper conduct from their having, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from GoodRx that was tied to the performance or artificially inflated valuation of GoodRx, or

received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

150.   Plaintiff, as a shareholder and representative of GoodRx, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

151.   Plaintiff on behalf of GoodRx has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Waste of Corporate Assets

152.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

153.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (such as the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

154.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

155.   Plaintiff on behalf of GoodRx has no adequate remedy at law.

## FOURTH CLAIM

### Against Defendants Hirsch, Bezdek, and Voermann for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

156.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

157.   GoodRx, along with Defendants Hirsch, Bezdek, and Voermann are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC

Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Hirsch, Bezdek, and Voermann's willful and/or reckless violations of their obligations as officers and/or directors of GoodRx.

158.   Defendants Hirsch, Bezdek, and Voermann, because of their positions of control and authority as officers and/or directors of GoodRx, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of GoodRx, including the wrongful acts complained of herein and in the Securities Class Action.

159.   Accordingly, Defendants Hirsch, Bezdek, and Voermann are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

160.   As such, GoodRx is entitled to receive all appropriate contribution or indemnification from Defendants Hirsch, Bezdek, and Voermann.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of GoodRx, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to GoodRx;

(c)   Determining and awarding to GoodRx the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing GoodRx and the Individual Defendants to take all necessary

actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect GoodRx and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of GoodRx to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding GoodRx restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 29, 2021          Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Robert C. Moest*
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628

45

Verified Shareholder Derivative Complaint

Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **<u>VERIFICATION</u>**

I, Neesha Patel am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2021.

4/29/2021

DocuSigned by:

*Neesha Patel*

E3F0B5C7838C4FB...

_____

Neesha Patel